# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Leda D. Wettre |
| | : | |
| | : | |
| v. | : | Mag. No. 18-8177 |
| | : | |
| | : | |
| PAVANDEEP BAKHSHI | : | CRIMINAL COMPLAINT |
| | : | |
| | : | |

I, Mark Petruzzi, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent of the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

_____
Mark Petruzzi, Special Agent
Federal Bureau of Investigation

Sworn to before me, and
subscribed in my presence

September 19, 2018 at
Newark, New Jersey

HONORABLE LEDA D. WETTRE
UNITED STATES MAGISTRATE JUDGE

_____
Signature of Judicial Officer

## ATTACHMENT A
### Count One
### (Conspiracy to Commit Securities Fraud)

Beginning in or about May 2015 through in or about September 2017, in the District of New Jersey and elsewhere, defendant

### PAVANDEEP BAKHSHI

knowingly and intentionally conspired and agreed with others to commit an offense against the United States, namely, securities fraud, in that they willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all contrary to Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

### Overt Acts

In furtherance of the conspiracy and to effect its unlawful object, the following overt acts, among others, were committed in the District of New Jersey and elsewhere.  The names of the entities referenced below are further defined in Attachment B to this Complaint.

a.      On or about December 11, 2015, defendant BAKHSHI sent an email to co-conspirator Sam Zaharis relating to a press release that Company A had issued announcing a phony acquisition that BAKHSHI and his co-conspirators orchestrated in furtherance of the scheme.

b.      On or about March 20, 2016, defendant BAKHSHI sent an email to co-conspirator Paul Parmar and others discussing a press release that Company A was preparing to issue that included fabricated figures concerning the number of doctors that Company A had on its platform.

c.      On or about July 29, 2016, co-conspirators Paul Parmar and Sam Zaharis met with a representative of the Private Investment Firm at an office in or around Hazlet, New Jersey.

In violation of Title 18, United States Code, Section 371.

**Count Two**
**(Securities Fraud)**

From no later than in or about April 2016 through on or about January 30, 2017, in the District of New Jersey and elsewhere, defendant

**PAVANDEEP BAKHSHI**

by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, knowingly and willfully used manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5 in connection with the purchases and sales of securities, to wit, Class A Units issued by a company affiliated with Company A, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, namely, by engaging in deceptive and fraudulent acts upon purchasers of Class A Units of a company affiliated with Company A in connection with the Go-Private Transaction described below.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

3

## ATTACHMENT B

I, Mark Petruzzi, a Special Agent with the Federal Bureau of Investigation, having conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation and other individuals with knowledge of the facts set forth below, have knowledge of the following facts.  Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation.  Rather, I have set forth only the facts that I believe are necessary to establish probable cause.  Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part.

## BACKGROUND

1.      At times relevant to this Complaint:

        a.      "Company A" was a publicly-traded company that, through a web of operating subsidiaries, provided outsourced revenue cycle management ("RCM"), physician practice management, and other related services to hospitals and medical practices in the United States.  Company A was incorporated in Delaware in or around September 2014 for the purpose of becoming a holding company for the "Operating Company," which owned several subsidiary entities engaged in the businesses referenced above.  In or around December 2014, Company A's securities began trading on the Alternative Investment Market ("AIM") of the London Stock Exchange ("LSE").  Company A was later taken private through a domestic merger transaction consummated in the United States and described below, which closed on or about January 30, 2017.

        b.      The "Private Investment Firm" was a private investment management firm based in New York City that sought to acquire, own and operate businesses by providing long-term capital solutions.

        c.      Defendant PAVANDEEP BAKHSHI ("BAKHSHI") was a resident of New York City and London and was a member of Company A's board of directors.

        d.      Parmjit Parmar, a/k/a "Paul Parmar" ("Parmar"), was a resident of New Jersey and was the Chief Executive Officer of Company A from its inception through in or about September 2017.  Parmar also was a member of Company A's board of directors.  Until in or around January 2017, Parmar, and various other entities he owned and controlled, owned the majority of Company A's shares.

   e. Sotirios Zaharis, a/k/a "Sam Zaharis" ("Zaharis"), was a resident of New Jersey and was the Chief Financial Officer of Company A.  He also served on its board of directors.

   f. Ravi Chivukula ("Chivukula") was a resident of New Jersey and served as the Chief Financial Officer of the Operating Company.  He also was a member of Company A's board of directors.

### THE SCHEME TO DEFRAUD

   2. Between in or about May 2015 through in or about September 2017, BAKHSHI participated an elaborate scheme to defraud the Private Investment Firm and others out of hundreds of millions of dollars in connection with the funding of a "going private" transaction whereby Company A, which was publicly traded on the LSE's AIM, was taken private through a series of transactions that will be referred to herein collectively as either the "Go-Private Transaction" or the "Merger."  As part of the financing of the Go-Private Transaction, the Private Investment Firm put up approximately $82 million in equity and a consortium of financial institutions (the "Lenders") provided another approximately $130 million in debt.  The scheme was accomplished through a variety of fraudulent methods designed to grossly inflate the value of Company A and trick the Private Investment Firm and others into believing that Company A was worth substantially more than its actual value.

   3. The scheme to present a materially false picture of the financial health of Company A began with several secondary offerings on the AIM whereby the co-conspirators sought to raise tens of millions of dollars in the public markets purportedly to fund Company A's acquisitions of various operating subsidiaries.  In reality, a number of those entities either did not exist or had only a fraction of the operating income attributed to them.  The evidence developed to date indicates that the co-conspirators then funneled the proceeds of these secondary offerings through bank accounts they controlled and used the money for a variety of purposes that had nothing to do with acquiring the purported acquisition targets.  Rather, the money from one of the offerings was used to, among other things, make it appear as if the Operating Company had substantial customer revenue when, in fact, the funds were simply transfers of the money that had been raised in the secondary offering.  The co-conspirators went to great lengths to make it appear that these funds were revenue, concocting phony customers and altering bank statements to make it appear as if the funds were coming from customers.  In fact, the purported revenues and, in many cases, the customers, were complete fabrications.

   4. The co-conspirators employed a variety of fraudulent techniques before and in the course of the Go-Private Transaction to induce the Private

Investment Firm and others to fund the transaction.  These tactics included, but were not limited to: (1) creating fictitious operating companies that Company A purportedly acquired in sham acquisitions that the co-conspirators simply made up; (2) falsifying and, in some cases, wholly fabricating, bank records of subsidiary entities in order to generate a phony picture of Company A's revenue streams; (3) generating fake income streams and, in some cases, fabricating customers of Company A and its subsidiaries; (4) and making other material misrepresentations and omissions to representatives of the Private Investment Firm and others.  Through these actions, BAKHSHI and his co-conspirators caused the Private Investment Firm and others to value Company A at over $300 million for purposes of financing the Go-Private Transaction.

### A. <u>Background of the Go-Private Transaction</u>

5.     Between no later than in or around April 2016 and November 2016, the Private Investment Firm and Company A engaged in negotiations relating to the Go-Private Transaction.  The Go-Private Transaction was structured so that a special purpose entity managed by the Private Investment Firm would ultimately own a controlling interest in Company A and the balance would be owned by a Parmar-controlled entity.

6.     During the negotiations of the Go-Private Transaction and related due diligence activities by the Private Investment Firm, Parmar controlled Company A and was the key member of its senior management interfacing with the Private Investment Firm.  BAKHSHI, Zaharis, and Chivukula actively supported Parmar in these efforts.

7.     In or around June 2016, Parmar, Zaharis, and Chivukula made a presentation to the Private Investment Firm during which they portrayed Company A as a growing force in the medical billing industry, touting the company's expansion of operations into over twenty states through its organic growth and numerous acquisitions, including the following three separate purported medical billing and/or RCM businesses: MDRX Medical Billing ("MDRX"); Phoenix Health, LLC ("Phoenix"); and Northstar First Health, LLC ("Northstar").  BAKHSHI assisted in preparing the PowerPoint presentation for the meeting.

8.     Pointing to organic growth and Company A's acquisitions, Parmar represented to the Private Investment Firm that Company A's EBIDTA[1] and revenue were growing rapidly and exceeded expectations in the fifteen months following its listing on the AIM.

---

[1] "EBIDTA" refers to a company's earnings before interest, taxes, depreciation, and amortization and is a measure commonly used to evaluate a company's financial performance in a given period of time.

9.      Additionally, during the negotiations, the co-conspirators provided extensive documents to the Private Investment Firm regarding Company A's purported financial condition, performance and business operations.  These documents included Company A's public filings on the AIM, presentations that the co-conspirators made to the Private Investment Firm, financial statements for certain of Company A's subsidiary companies, information about numerous purported customers of Company A and its subsidiaries, bank records, and customer contracts.  The co-conspirators represented to the Private Investment Firm that the information in these materials was true and accurate, and the Private Investment Firm relied on these representations in deciding to pursue the Go-Private Transaction.  As explained further below, however, many of these documents contained material misrepresentations or omissions, or were completely fabricated by the co-conspirators, in furtherance of the scheme.

10.     Based upon the information provided by the co-conspirators, the Private Investment Firm valued Company A at more than $300 million.

11.     In furtherance of the Go-Private Transaction, Company A, through Parmar, made specific representations and warranties in the merger agreement and subscription agreement (the "Merger Documents") that the Private Investment Firm ultimately signed.  Specifically, Company A represented in the merger agreement that its financial statements were truthful and accurate, that there were no false entries in Company A's accounting records, that Company A's accounts receivable were the result of legitimate transactions, and that its material contracts were real and enforceable.  Notably, Parmar and certain of his controlled entities also agreed in the subscription agreement to indemnify the Private Investment Firm for "any intentional misrepresentations and fraud on the part of [Company A] or any seller."

12.     In reliance of the co-conspirators' material misrepresentations and omissions, on or about November 24, 2016, the Private Investment Firm signed the Merger Documents to consummate the Go-Private Transaction.  Pursuant to the terms of the Merger Documents, the Private Investment Firm agreed to pay approximately $88 million in cash for a 50.7% economic interest in Company A after its conversion to a private entity following the transaction.  As set forth in the subscription agreement, the Private Investment Firm received approximately 30,268,763 Class A Units of the newly formed entity.  Additionally, the Lenders agreed to lend up to approximately $145 million to finance the Merger.  Company A issued unsecured promissory notes to its shareholders to generate the remaining approximately $40 million.  PARMAR, as Company A's largest shareholder, received the majority of the proceeds from the Go-Private transaction, and an approximately 49.3% economic interest in the new private company.  The Go-Private Transaction closed on or about January 30, 2017, with the Private Investment Firm contributing approximately $82.5 million in equity and the Lenders providing approximately $130 million in debt financing.

13.    As set forth below, the investigation to date has revealed several categories of fraudulent conduct by BAKHSHI and his co-conspirators in connection with the Go-Private Transaction.

## B. Fake Operating Companies and Sham Acquisitions

14.    Between in or around May 2015 and February 2016, BAKHSHI and his co-conspirators orchestrated sham acquisitions by Company A of MDRX, Phoenix, and Northstar to inflate Company A's revenues, EBIDTA, and overall value.  Each of the three transactions followed a similar pattern: Company A raised money for the purported acquisition through a secondary stock offering on the AIM; the target or acquired company was formed only shortly before the announced acquisition; and the funds raised for the acquisition appear to have been used for other purposes.  The co-conspirators nevertheless falsified the books and records of Company A to cause its general ledger to appear as though the funds raised during the secondary offerings had been used for the acquisition.  Two of the three acquired companies, MDRX and Phoenix, were fictitious entities that the co-conspirators created in connection with the scheme.  The other company, Northstar, had at least one real asset, but the co-conspirators grossly inflated the value of the company in furtherance of the scheme.

### 1. *The MDRX Fraud*

*The Theft of a Corporate Identity*

15.    One of the fraudulent acquisitions involved the purported purchase of MDRX.  BAKHSHI played a central role in the MDRX aspect of the fraud, including assisting with the preparation and development of a stock purchase agreement among MDRX's purported shareholders, MDRX's website, and Company A's press release announcing the acquisition.

16.    The FBI has reviewed a regulatory release Company A issued and filed with the LSE on or about December 11, 2015, concerning the secondary offering of shares by Company A and the purported use of a substantial portion of the proceeds to acquire MDRX.  In particular, in a Regulatory News Service ("RNS")[2] announcement issued on December 11, 2015, entitled "Proposed Placing & Conditional Acquisition," Company A announced its intention to raise approximately £30 million (approximately $45.5 million) (before expenses) through a secondary offering on the AIM.  The December 11, 2015 RNS also announced that Company A "had entered into a conditional share purchase

---

[2] The Regulatory News Service ("RNS") is a service that the LSE provides for issuing detailed market information for publicly traded companies listed on the LSE.

agreement to acquire MDRX for up to $30.0 million." Parmar is quoted in the December 11, 2015 RNS as stating that "[t]he acquisition of MDRX will be our fourth acquisition since IPO last year and we are very excited about its prospects in the context of the Group."

17.     As noted in greater detail below, the investigation has revealed that, in reality, MDRX did not exist. Not only did BAKHSHI and his co-conspirators fabricate this company, but documents and witness statements reflect that they also stole the description of MDRX that they used in the December 11, 2015 RNS from pitch materials Parmar and Zaharis had previously received relating to the possible recapitalization of a real company operating in the RCM space. This real company will be referred to herein as Company M.

18.     In or about October 2015, financial advisors for Company M, who were seeking to recapitalize it, sent a confidential information memorandum ("CIM") to Company A for review by Parmar and Zaharis. The CIM shows that it was furnished to potential investors on the understanding that it would be used only to evaluate whether to invest in Company M.

19.     Documents nevertheless show that the co-conspirators used the description of Company M in the CIM to generate the phony description of MDRX they used in the December 11, 2015 RNS, in many cases lifting the description word for word from the CIM. The remarkable similarities included the following:

   a. The CIM listed Company M as being based in Akron, Ohio, and contained references to Chicago, Cincinnati, Cleveland, Columbus and Wheeling. The co-conspirators wrote in the RNS that MDRX was "based in Akron, Ohio and has offices in Chicago, Cincinnati, Cleveland, Columbus and Wheeling."

   b. The CIM described Company M as "a leading national provider of outsourced healthcare practice management and consulting services, including outsourced billing, collections operations and financial management primarily to both independent and health system-based physician groups." The co-conspirators largely copied this description when writing about MDRX in the RNS: "MDRX is a national provider of outsourced hospital practice management, private practice management and consulting services (including outsourced billing, collections, operations and financial management) to both independent and health system-based physician groups in the US."

   c. The CIM also contained a "Practice Overview" section which had as a subheading the following description:  "[Company M] offers a

uniquely comprehensive set of turnkey healthcare management services, which allow medical practices to improve their profitability, cash cycle management and operations workflow." The co-conspirators lifted this description almost verbatim and included it in the December 11, 2015 RNS, noting, "MDRX offers a comprehensive set of turnkey healthcare management services which allow medical practices to improve their profitability, cash cycle management and operations workflow."

20.     The same day that Company A issued the December 11, 2015 RNS announcing the secondary offering and the agreement to acquire MDRX, Zaharis received an email from one of the individuals who had served as a financial advisor for Company M in connection with its efforts to recapitalize. The financial advisor wrote: "Sam, I just left you a voicemail on an important matter concerning [Company A's] announcement of the MDRX acquisition.  In reading the press release we noticed that the company description appears nearly identical to the [Company M] description in our Confidential Information Memorandum (e.g., based in Akron, the last sentence is verbatim from our subheader on page 7).  As we are not familiar with MDRX, we wanted to confirm with you which of these facts are in fact correct and which may have been clerical errors. Please advise."  Zaharis promptly forwarded this email to others, including Parmar and BAKHSHI.  In one such email to BAKHSHI, Zaharis wrote, "Not good…................."  BAKHSHI replied simply, "Oh fuck." When Zaharis replied that he would call BAKHSHI, BAKHSHI responded, "Pls. We need to be ready for this."

21.     Several days later, Zaharis and Parmar had scheduled a call with the financial advisor, and, on December 14, 2015, Zaharis sent Parmar an email entitled "Speech for the Broker of [Company M]."  Parmar replied by asking Zaharis to have the document printed so Parmar would have it in front of him when he spoke with Company M's financial advisor.

22.     The FBI has interviewed the financial advisor who represented Company M in its efforts to recapitalize about his interactions with Zaharis and Parmar.  The financial advisor stated that he had several calls with Zaharis and a call with Parmar about the possibility of Company A buying Company M. The financial advisor said that Zaharis had submitted an indication of interest on behalf of Company A, but that Company M had decided not to proceed with a sale from any of its potential buyers.  The financial advisor added that sometime later, he saw a press release from Company A describing the purchase of a company that did the same thing as Company M.  The financial advisor noted that the press release used either the exact language or language that was very similar to that used by Company M in its CIM.  The financial advisor said he contacted Zaharis about the similarities, and Zaharis said he would look into it.  Zaharis then called back several days later and told the

financial advisor that his public relations firm had two books and had mistakenly taken language from the wrong book.

23.    The explanation given by Zaharis to the financial advisor that there was a mix-up by Company A's public relations firm is belied by other documents showing that the co-conspirators knowingly stole the description of MDRX directly from Company M's CIM.  In a series of emails Chivukula sent to Parmar and Zaharis on October 22, 2015, Chivukula made clear that he was creating, among other documents, a document called MDRX Medical Billing LLC Due Diligence Findings.  The FBI has reviewed the document with this label and it contains nearly identical sections to the Company M CIM. Chivukula's emails make clear that he was using the Company M CIM to create the purported MDRX Due Diligence Findings.  For instance, when he circulated the draft to Parmar and Zaharis, Chivukula noted that he was "not able to edit the name of [Company M] in the header."  He also noted that he was "not able to remove the background image of [Company M] in the presentation."

24.    Several weeks later, as Company A was preparing a press release announcing the completion of the MDRX acquisition, BAKHSHI and his co-conspirators continued to take steps to conceal their fraudulent conduct.  On January 27, 2016, BAKHSHI sent an email to Parmar and Zaharis attaching a draft of the RNS.  The draft press release provided a description of MDRX, including the locations in which it purportedly operated.  The body of the email reads, "please have a look and edit as appropriate.  Sam, should we have the detailed description of MDRX in the release.  I would suggest no and just say we have closed MDRX.  Please let me know."  Later the same day, Parmar responded, "We need to remove the locations because we don't want the Broker on [Company M] to call us back about the overlap of locations with the places they trade from."

*False Representations Concerning MDRX's Revenue*

25.    Having stolen the corporate identity of Company M and fabricated a company they called "MDRX Medical Billing LLC," the co-conspirators proceeded to falsely represent that MDRX was a real, viable company with a substantial customer base and significant revenues.

26.    On or about February 10, 2016, Company A issued a press release announcing its acquisition of MDRX for $28 million, stating that MDRX had "a nationwide presence and brings approximately 3,500 more physicians on the [Company A] platform."  In the announcement, Parmar made the following statement:

> The closing of the MDRX transaction will further increase [Company A's] revenue and significant cost savings will be borne out by MDRX being part of the [Company A] platform.  MDRX will

be our fourth acquisition since our IPO.  We continue to evaluate a pipeline of acquisition opportunities which meet our strict criteria of being able to generate recurring revenue while generating significant profitability.  MDRX augments the existing Physicians on the [Company A] platform in States such as California, Florida and New York and adds new geographies such as Alabama, Louisiana, New Mexico and Utah. With this transaction completed [Company A] will collect approximately $2 billion annually for physicians across the US and will increase our footprint in new territories.

27.     Numerous documents obtained during the investigation demonstrate that MDRX did not exist prior to this transaction.  According to the Certificate of Formation for MDRX, the company was formed on December 7, 2015, right before the December 11, 2015 RNS announcing the secondary offering and the purported MDRX transaction, and approximately two months before the acquisition purported to close.  Moreover, the stock purchase agreement between MDRX and Company A is a 58-page, detailed contract, the likes of which typically would be heavily negotiated over the course of time between the parties to the contract.  Here, however, the stock purchase agreement is dated December 7, 2015 – the very day on which MDRX purportedly was formed.  Between November and December 2015, BAKHSHI and his co-conspirators exchanged numerous emails attaching drafts of the stock purchase agreement.  The signature block corresponding to MDRX on page 58 of the stock purchase agreement reflects that it was signed by "Jack White," purportedly the CEO of MDRX.  In addition, the stock purchase agreement reflects that MDRX's address was "166 High Street" in Akron, Ohio. The FBI has confirmed through various investigative steps that there is no "166 High Street" in Akron, Ohio.  Although there is a 166 "S. High Street," that address is occupied by the City of Akron's government offices.  No entity with MDRX's name has operated there.

28.     Email communications reviewed in the investigation further demonstrate the fraudulent nature of Company A's purported acquisition of MDRX.  For instance, on or about September 23, 2016, Zaharis sent Chivukula an email with the subject line "who did we say we acquired MDRX from." Zaharis went on to write the following in the body of the email:  "My hard drive with the info is upstairs in the bed room [sic] and they are all sleeping." Chivukula responded by writing simply, "APEX healthcare systems[.]"

29.     In an earlier email dated March 11, 2016, Zaharis sent Chivukula a copy of a notice to MDRX from the IRS advising MDRX that the IRS had assigned it an employer identification number ("EIN").  The date of the notice is March 11, 2016.  This document reflects that MDRX did not have an EIN, a basic identifier used by companies doing business in the United States, until over a month after the announcement of Company A's acquisition of it.

30.    Likewise, on March 4, 2016, Parmar sent an email regarding MDRX to BAKHSHI, copying Zaharis and Chivukula, and wrote, "Pav, Can you pl. Work on the agreement, also I need a bunch of invoices made, pl. Call me in the morning so we can discuss all the open items.  1. Software note[,] 2. Invoices[,] 3. Calling regus offices and coordinating the mail back[,] 4. Mdrx contract[.]  Paul."

31.    In addition, in an email exchange on or about March 20, 2016, BAKHSHI, Parmar and Zaharis discussed a draft press release detailing Company A's 2015 financial results.  In the emails, BAKHSHI and his co-conspirators discussed the number of doctors the press release would say were on Company A's platform.  Specifically, in one of the emails, Zaharis wrote, "We also need to agree on the number of doctors on our platform.  Do we say approximately 12,000 that is the number that I am going to put in so please let me know if you want to mention another number or delete."  In response, BAKHSHI questioned whether 12,000 doctors would be a credible figure, writing, "on the rns of 16th sept we say that we have 6,000 doctors on the platform.  So that would mean we gained 6,000 additional doctors in less than 3 months."  Parmar then stated, "10000 sounds good.  Let's do the math[.] 50m should mean about 1.5 bil of collections at 3.5% fee if Rev per doc is 225k then that means 6400 doctors.  And on GPO side if we say we have 3500 docs that would be approx. 10,000 physicians before MDRX.  So it should say as of Dec 2015 company services over 10,000 independent practicing and hospital employed/contracted physician groups with its various service offerings."

32.    The co-conspirators not only fabricated MDRX, but they misrepresented to the Private Investment Firm during the due diligence phase of the Go-Private transaction that it had substantial earnings prior to its purported acquisition by Company A.  For instance, on or about October 14, 2016, Parmar sent an email to a representative of the Private Investment Firm who was responsible for much of the financial due diligence and to Zaharis. The subject of the email was "Updated financials."  Parmar attached to the email a spreadsheet purporting to be Company A's "Consolidated Financial Model."  The model contained a tab that purported to show MDRX's consolidated statements of operations.  Despite the fact that MDRX was not even formed as a corporate entity until December 7, 2015, this consolidated statement of operations falsely showed positive earnings information dating as far back as January 2015.

33.    Bank records and other documents also show that, in connection with the secondary offering announced on December 11, 2015 that supposedly was going towards funding the (bogus) acquisition of MDRX, the co-conspirators diverted those funds to other uses, and falsified the books and records of Company A.  A comparison of Company A's general ledger and its associated bank accounts reflects efforts by the co-conspirators to conceal the

fraud.  Specifically, Company A's general ledger shows that Company A received approximately $36.8 million on or about January 8, 2016 from the capital raise in the secondary stock offering on the AIM.  The general ledger further shows disbursements of approximately $35 million on or about February 9, 2016, which were described as payment for the acquisition of MDRX.

34.    While the bank records confirm Company A's receipt of the approximately $36 million in January 2016, the transactions in the account in or around February 2016 and over the next several months establish that the funds were not used for an acquisition.  Rather, the bank records show numerous transfers to other accounts affiliated with Company A and/or other entities, including the Operating Company, Parmar, a law firm, and others.  Approximately $7 million of the funds was transferred to the Operating Company in a series of smaller transfers and recorded in the Operating Company's general ledger as "AR payments" from specific customers, many of which appear to be fake.  In reality, the co-conspirators simply funneled some of the proceeds from the stock offering to the Operating Company to create fictitious customer income and to fraudulently inflate the company's revenue streams.

35.    For instance, on January 27, 2016, approximately $102,753 was sent from Company A's bank account to the Operating Company's bank account in four separate transfers.  Each incoming bank transfer supported a phony entry in the Operating Company's general ledger purporting to show that the money was a receivable from a medical practice customer of the Operating Company.  Law enforcement's investigation shows that, in reality, these transfers were simply inter-company transfers and that the medical practices that were supposedly paying the money to the Operating Company either did not exist or did not have a relationship with the Operating Company.  This is demonstrated by the co-conspirators' efforts to lease temporary office space in the names of these and other purported customers of the Operating Company, as explained further below.

36.    This pattern of transfers designed to support false general ledger entries continued on numerous dates between January and July 2016 and resulted in millions of dollars in manufactured revenue to the Operating Company.  A detailed example of one of these related-company transfers is described below in paragraph 51.

2.  *Other Sham Acquisitions*

37.    Prior to the purported acquisition of MDRX, on or about September 16, 2015, Company A announced its acquisition of Northstar for approximately $18 million.  Company A's bank account statements reflect that, in May 2015, Company A had raised approximately $15.8 million through a secondary stock

offering on the AIM. Company A's press release announcing the acquisition
described Northstar as having a "stable client base of healthcare providers
under recurring revenue contracts[,]" particularly 77 retained clients, as well as
233 employees (125 of which the release claims are in the United States, with
the remaining employees in India). The release also stated that Northstar had
year-end revenue in 2014 of approximately $7.9 million and EBITDA of $1.9
million.

38.     According to Northstar's Certificate of Formation, it was formed on
or about June 12, 2015, just a few months before Company A's claimed
acquisition of it. Moreover, according to a copy of a purchase agreement, on or
about September 2, 2015, Northstar purchased a business (the "Business
Asset") for approximately $2,785,000. Further, based on a review of Company
A's bank records, it does not appear that the approximately $15 million that it
received from the secondary offering was used for an acquisition, other than
the Business Asset. Rather, the bank records show numerous transfers to
other individuals and entities over the course of several months following the
deposit of the offering proceeds.

39.     Last, on or about September 18, 2015, two days after Company A
announced the Northstar transaction, Company A announced its acquisition of
Phoenix, which it described as a company employing 138 people with revenue
of $9.8 million as of the end of 2014. According to the press release
announcing the acquisition, Company A acquired Phoenix for approximately
$14 million.

40.     Notably, according to a Certificate of Formation obtained in the
investigation, Phoenix was formed on September 11, 2015, just one week prior
to the announcement of the acquisition. Further, email communications
between Chivukula, Zaharis and others, from October 2015 indicate that
Phoenix did not have an EIN as of that time (over one month after the
acquisition announcement). Specifically, on or about October 28, 2015,
Chivukula emailed one of Company A's outside attorneys (copying Zaharis) and
asked, "Can you please send the incorporation documents for Phoenix. We
need to open a bank account and need these documents to get it going." The
attorney replied and attached certain documents and, in response, Chivukula
stated, "Do you also have the EIN letter for Phoenix?" The attorney responded,
"No," and then Chivukula forwarded the attorney's response to Zaharis and
stated, "Sam, we cannot open a bank account without an EIN number.
Normally, [the attorney's] office applies for these. I can do this online too, but I
need [Parmar's] SSN number." After a few additional emails back and forth
regarding the information needed to apply for an EIN, Chivukula emailed
Zaharis and stated, "I am mentioning the location of the business as Houston,
Texas. Let me know if you think otherwise." Zaharis responded, "Ok. You can
see from the rns where we say they are located." Chivukula replied, "I need a
physical address, and I am using the Houston office address."

15

41.    The Government has obtained a copy of a notice from the IRS to Phoenix dated November 27, 2015 advising it of its EIN.  The notice was issued to Phoenix at the address of Company A's principal place of business in Houston, Texas, as reflected in Company A's consolidated financial statements for 2014 and 2015.

42.    Several weeks after the above-referenced October 2015 emails, and approximately two months after the announcement of the purported acquisition of Phoenix, Zaharis emailed Parmar about creating a "sale agreement" for Phoenix and modeling it on a Northstar sale agreement that was purportedly signed on behalf of Northstar by "Bobby Kumar."  Specifically, on or about November 18, 2015, Zaharis emailed Parmar and stated, "PP, [w]e have to create a Phoenix sale agreement much like the Northstar one that we had RAI's lawyer approve.  The actual Northstar contract shared with RAI is attached.  I need your help to fill out the following for Phoenix … For Northstar, we had 'Bobby Kumar' ….. *who will we have for Phoenix?*" (emphasis in original).  Later the same day, Zaharis forwarded this email with the attachment to BAKHSHI.  It is worth noting that a contract the co-conspirators ended up drafting to document the purported Phoenix transaction used the name "Vijay Kumar," and the signature block at the end of the document listed Northstar in place of Phoenix.

### C. **Bogus Customers and Customer Contracts**

43.    In addition to evidence of the fraudulent acquisitions described above, the investigation has revealed that numerous of the purported customers and associated revenue of certain of Company A's subsidiaries, including the Operating Company, are fictitious.

44.    During the due diligence phase of the Go-Private Transaction, the Private Investment Firm was interested in seeing revenue and earnings data supporting Company A's organic growth rate.  In this regard, during the due diligence, the co-conspirators sent the Private Investment Firm information concerning customer revenue for the Operating Company, among other entities.  For instance, on July 22, 2016, Chivukula sent an email to representatives of the Private Investment Firm copying Parmar and Zaharis.  The email attached an Excel spreadsheet entitled "[Company A] Client – State – Fee – Tenure – Speciality collections and transactions.xlsx."  The body of the email stated: Attached is the collections and # of transactions data from 2013 to 2016."  The spreadsheet included revenue figures for 2015 for approximately 33 purported customers of the Operating Company.  The investigation has revealed that these customers either did not exist or had no relationship with the Operating Company.  Indeed, the FBI has obtained records from a company that provides temporary office space in the United States and elsewhere, and virtual office space, indicating that, in or around late January 2016, ZAHARIS

leased temporary office space at various locations throughout the country for these same 33 companies.  This evidence suggests that the co-conspirators simply made up these customers (and the associated revenue) and then attempted to create real addresses for them by leasing office space in their names.

45.    The co-conspirators employed similar tactics to fabricate customers of MDRX.  Specifically, there were approximately 44 customers associated with MDRX in Company A's accounting records and in some of the financial records that the co-conspirators provided the Private Investment Firm during its due diligence.  Law enforcement has reviewed nine customer contracts between a medical billing entity that MDRX claimed to have acquired and purported medical providers.  These medical providers are listed in certain of MDRX's financial records as customers of MDRX.  Open source searches revealed that the addresses for the medical providers as set forth in the contracts are temporary office addresses.  Representatives of these office locations have confirmed with law enforcement that they have no record of the purported MDRX customers doing business or occupying space there. Additional open source searches regarding the names of the individuals who purportedly signed these contracts on behalf of the medical providers revealed no affiliations between the names in the contract and the entity for which that person signed.  This further demonstrates the fraudulent nature of these contracts, and MDRX more generally.  Further, law enforcement has been unable to confirm through open source searches the existence of the remaining 35 MDRX customers at the addresses listed for the customers in Company A's records.

46.    These findings are corroborated by email communications between the co-conspirators.  For example, on July 22, 2016 (more than five months after Company A announced its acquisition of MDRX), and the same day the co-conspirators sent the Private Investment Firm the spreadsheet of customer revenue figures discussed above, Zaharis sent Parmar an email that stated:

Paul,

For the audit we will need to prepare client contracts for MDRX physicians that we now have on our books. We have to create 60+ agreements that we inherited as part of the acquisition.  We need these for [the Accounting Firm] plus maybe also for the legal due diligence schedule for [the Private Investment Firm].

I need your help on the following:

- I need to know the name of the entity we should say is signing the agreements.  I don't think we should use

17

> MDRX as per the Asset Sale Agreement but another
> name .....can you suggest one to use?  It will be the
> same name that we will use for the company wide
> expenses we are going to create for their P&L.

47.    On or about November 16, 2016, Zaharis sent an email to
Company A's outside counsel requesting that counsel create several "Delaware
LLC's," including "Apex Healthcare LLC[.]"  As noted above in paragraph 26, on
or about September 23, 2016, Zaharis told Chivukula that they had previously
said they had acquired MDRX from "APEX healthcare systems."

48.    The co-conspirators' creation of false records to conceal their
scheme continued even after the Go-Private transaction closed.  For instance,
on or about February 22, 2017, Zaharis emailed Parmar seeking a telephone
number to use on certain purported customer invoices.  The email stated, "If
you have [a] spare parked T-Mobile number ....can we change it to Ohio centric
so we can use it on the invoices we send from Apex Healthcare Systems[?]
Then we put it in a phone and record a suitable message as well[.]  We say
Apex was in Dayton so it should be a Dayton area code which is 937[.]"  This
email, and others collected in the investigation, suggests that the co-
conspirators simply fabricated customer invoices to create the appearance of
real customers that generated revenue to Company A.

## D. Fabricated and Altered Bank Statements

49.    In addition to the above, the co-conspirators also altered records
relating to the Operating Company's bank accounts to create fictitious revenue
to the Operating Company.  The Operating Company's revenue, as Company
A's primary subsidiary, had a significant impact on Company A's overall
financial performance.

50.    Email correspondence among the co-conspirators demonstrates
their efforts to alter bank records and, in some instances, to create them from
scratch.  With some of the emails, the co-conspirators attached the phony bank
statements in Microsoft Word or Excel form.  For example, on or about
February 20, 2016, Chivukula emailed Parmar and Zaharis and attached
numerous documents.  The body of the email stated, "Paul[,] attached are the
bank statements in excel and pdf.  I am not able to get the bar code for Nov
and December in the right format in word.  Thanks, Ravi".  Similarly, on or
about January 25, 2017, Zaharis emailed Parmar and discussed the placement
of a wire transfer into a bank statement.  The email stated, "I don't think we
make it on page 1 ... I think we have it as the 1st one on page 2[.]  We will need
to change the complete description ... we can cut and paste the one from page
97 that you did ... where you made it $1.1m[.]  We will need to tweak [a] few
things from the one wire to the new one ..the TFN and the month/date."  In
another email on or about February 15, 2016, Parmar emailed Chivukula and

copied Zaharis and BAKHSHI and stated, "I have not been able to work on new statements, I will finish Jan 2016 and Jan 2015 and send in the next two hours, can you pl. Do June and May and tonight I will do Feb 2015 and you can finish March and april."

51.    Additionally, a comparison of some of the bank account statements that the co-conspirators created in Excel form and the real bank records from the bank reveal substantial discrepancies.  As just one example, the Operating Company's January 2016 account statement that the Government obtained directly from the bank reflects an incoming wire transfer on January 29, 2016 in the amount of $43,673.  The source of the wire transfer is Company A. Company A's bank records also show the corresponding outbound wire to the Operating Company.  However, a fabricated bank statement that the co-conspirators created for the same account during the same time period attributes this incoming wire transfer to an account belonging to "Chiropractic Care," a purported customer entity that law enforcement has confirmed to be fictitious.  The Operating Company's general ledger also claims that this transfer was for a receivable from "Chiropractic Care."  The phony entries in the fake bank statement and the general ledger made a simple transfer of funds from Company A to the Operating Company appear to be revenue from a legitimate, third-party source.

52.    The co-conspirators also generated fake bank account statements for MDRX which, as explained above, is a bogus entity that the co-conspirators created in furtherance of the scheme.  In or around March 2017, Zaharis and Chivukula discussed the details of various debits and credits in the purported bank account of MDRX.  In the email, Zaharis wrote, "Need to clean this up and to also include amount less bank charges transferred to main account [of the Operating Company] which will then mean a deposit entry in the main chase account on the same day."  The email attached a purported MDRX bank statement constructed in Microsoft Excel.  Law enforcement has confirmed with the bank reflected on these statements that it has no record of any accounts associated with MDRX.

53.    As set forth in detail above, the extensive and widespread nature of the fraud required substantial work and attention by the co-conspirators.  In one email between BAKHSHI and Zaharis on September 17, 2015, the day before Company A issued a press release announcing the bogus Phoenix acquisition, BAKHSHI stated, "we have zero bandwidth- we really need to hire some resources.  The problem is that the stuff we do can[']t be trusted to anyone."

### E. Impact of the Fraud on Company A's Financial Statements

54.    The scheme had a substantial impact on Company A's financial statements and resulted in grossly inflated revenue, income, and EBIDTA figures for the time period that the Private Investment Firm evaluated in determining to pursue to the Go-Private Transaction.

55.    The co-conspirators' scheme to defraud was uncovered in or around September 2017, at or around the time certain of the co-conspirators resigned from their positions with Company A or were terminated.  On or about March 16, 2018, Company A and numerous of its affiliated entities filed a petition for Chapter 11 relief in the United States Bankruptcy Court, Eastern District of New York.  The petition attributes Company A's financial demise, in large part, to the scheme described above.